IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Frank Leonette, | Case No: 23-cv-03394 |
| Plaintiff, | |
| v. | JURY DEMAND |
| Zeigler Chrysler Dodge Jeep-Downers Grove, LLC, | |
| Defendant. | |

**COMPLAINT**

Plaintiff Frank Leonette states as follows as his complaint against Defendant Zeigler Chrysler Dodge Jeep-Downers Grove, LLC ("Defendant" or "Zeigler"):

**SUMMARY**

1. Plaintiff Frank Leonette, a 69-year-old car salesman with an unblemished disciplinary record, was employed by Defendant Zeigler for over a decade. However, during his tenure Mr. Leonette discovered that the Zeigler dealership forged customer signatures on documents that fraudulently added the purchase of products or services that customers did not want or authorize. Mr. Leonette complained to management about these deceptive business practices, refused to participate in the illegal activity himself, and assisted a customer in challenging Zeigler's misconduct. Rather than addressing the corrupt business practices—shortly after Mr. Leonette's customer filed a police report regarding a forgery—Zeigler terminated Mr. Leonette's employment under false pretexts.

1

2. Mr. Leonette brings this action to remedy Zeigler's willful and intentional violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, the Illinois Whistleblower Act, 740 ILCS 174-1 *et seq.*, and the common law rights against retaliatory discharge of a whistleblower. Mr. Leonette timely filed an EEOC charge of age discrimination against Defendant on July 28, 2022.

## PARTIES

3. Plaintiff, Mr. Frank Leonette, is a citizen of the State of Illinois and was at all times relevant to this action.

4. Defendant, Zeigler Chrysler Dodge Jeep-Downers Grove, LLC, is a limited liability company organized under the laws of Michigan with its principal place of business in Kalamazoo, Michigan. On information and belief, Defendant has no members who are citizens of the State of Illinois.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1332 (Diversity), and 28 U.S.C. § 1367(a) (Supplemental Jurisdiction). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6. Venue is proper under 28 U.S.C. § 1391 in the Northern District of Illinois because both Mr. Leonette and the Defendant reside in this district and the events that gave rise to this claim occurred in this district.

**Background Facts**

7. Mr. Leonette was employed by Zeigler in its Downers Grove, Illinois dealership from September 19, 2009 until May 31, 2022 as a sales representative.

8. Mr. Leonette had exceptional sales results over his twelve years and 8 months of employment. Zeigler does not have a specific sales requirement for its representatives and representatives like Mr. Leonette are paid on a commission-only basis. While his sales fluctuated month-to-month over his tenure, he repeatedly achieved the President's Club award as one of the top salesmen, and Zeigler awarded him a Rolex for his outstanding performance.

9. During his employment, Mr. Leonette was an exemplary employee with an unblemished record. Zeigler has a policy and practice of providing employees with written notice of performance issues. Zeigler's "Employee Disciplinary Report" form provides for four written warnings, and requires the company to set forth the specific offense, facts leading up to the warning, corrective action to be taken by the company, and identification of the "next disciplinary step." The Employee Disciplinary Report must be signed by the supervisor, employee and a witness. Zeigler also has a policy and practice of providing an escalating form of discipline for employees with rule infractions. In other words, Zeigler does not jump right to termination for every infraction or area of concern.

10. In his more than twelve years with Zeigler, Mr. Leonette was never the subject of disciplinary issue, meaning no written warnings, no suspensions, no docking of pay, and no performance improvement plans.

11. By all accounts, Mr. Leonette was meeting Zeigler's legitimate business expectations throughout his tenure at the dealership.

### "The Old Guy"

12. After Mr. Leonette turned 65 years old, however, Zeigler and its management began pressuring him to retire.

13. Management made comments to and about Mr. Leonette referring to him as "the old guy" on the salesfloor. Management repeatedly asked Mr. Leonette when he was going to retire and questioned him about his Social Security and Medicare benefits.

14. The majority of the salesmen at Zeigler are under forty years of age, and Zeigler fails to hire older workers based on their age for the salesman position.

15. Mr. Leonette was satirized for being 'old' and was not offered the same opportunities as the young salesmen. For example, when working in a car dealership, it is important to have a desk close to the door in order to greet new customers. However, Zeigler moved Mr. Leonette's desk far away from the door, despite his long tenure with the dealership. Zeigler moved younger salesmen closer to the door.

### Zeigler's Fraudulent Business Practices

16. In the Fall of 2021, Mr. Leonette became aware of fraudulent and unlawful business practices by Zeigler.

17. On October 30, 2021, Mr. Leonette sold an automobile to one of Zeigler's customers. Unbeknownst to Mr. Leonette, however, Zeigler defrauded that customer by forging the customer's signature on a document to purchase a "Z-Guard Protection

Plan" that the customer never authorized or accepted. This fraudulent activity increased the customer's purchase price and increased revenues to Zeigler.

18. On November 1, 2021, Mr. Leonette's customer returned to Zeigler to question Mr. Leonette about the purchase amount because it was thousands of dollars higher than agreed.

19. Mr. Leonette collected the paperwork from the customer's purchase and gave it to Zeigler management to review. When reviewing the documents, Zeigler management told Mr. Leonette that the total purchase amount was higher due to the added services of a Z-Guard Protection Plan.

20. Mr. Leonette objected because the customer had not purchased the Z-Guard Protection Plan.

21. The customer likewise confirmed that he never agreed to purchase a Z-Guard Protection Plan and observed that the signature on the authorization form for the plan was a forgery.

22. On November 3, 2021 the customer complained of the forgery in writing to the president of Zeigler, Aaron Zeigler:

> After my initial discussions with the dealership team on Saturday, October 30 and after trying to figure out why my monthly payment obligation seemed to be excessive, I contacted my salesman, Frank Leonette and later met with him to review the contract. Upon review, Mr. Leonette, noticed that the contract price was about $2,000.00 higher than what was quoted in the original conversation. We determined that your Finance Director, David Schoonmaker had forged my signature on the Z Guard Protection Plan Document without any discussion with me nor with my concurrence. This was not only fraudulent but also of a criminal nature.

23. The customer later filed a police report regarding the forgery with the Downers Grove Police Department.

### Zeigler Ignores the Fraud and
### Initiates Termination Proceedings Against Leonette

24. Upon learning that Zeigler's finance department had forged the customer's signature on the sales documents, Mr. Leonette immediately reported this to his manager.

25. Mr. Leonette was a customer-friendly employee who opposed Zeigler's fraudulent business practices to steal money from customers by adding unwanted services to their purchases. He promptly reported the activity and refused to engage in such activity himself.

26. Zeigler wanted Mr. Leonette to turn a blind eye and/or cover up the finance department's actions. Mr. Leonette was directed not to discuss the matter further and to forget about it. The company promised that it would "take care of it." And it did just that.

27. It first swept the matter under the rug by removing the fraudulent charge, thus quieting the customer and reducing the interest and likely involvement of the local authorities.

28. Rather than addressing the actual forgery, the company continued to look the other way. Upon information and belief, Zeigler did not investigate the Zeigler employee (Dave Schoonmaker) alleged to have forged the customer authorization form.

6

Dave Schoonmaker was not disciplined for his illegal activity and is still the finance director at Zeigler's Downers Grove dealership to this day.

29. Zeigler then turned its attention to Mr. Leonette, the then 68-year-old veteran sales representative who refused to participate in the misconduct and reported the misconduct. It trumped up false claims against Mr. Leonette (unrelated to the company's forgery), created false disciplinary reports that were never shown to Mr. Leonette, and then terminated him three months later under the false pretext that Mr. Leonette was—for the first time in his twelve-year career—suddenly not meeting expectations.

30. And when Mr. Leonette pressed for the opportunity to prove himself and to cure any problems management had with his performance, he was told "no" and management informed him that the decision to terminate him had been in process for months.

31. Mr. Leonette, unlike other employees, was not given an opportunity to improve upon any identified issues with his performance. Mr. Leonette, unlike other employees, was never provided with a written warning about any issues regarding his performance. Mr. Leonette, unlike other employees, was not given a lesser form of discipline and was terminated immediately. Mr. Leonette, unlike other employees, was treated to harsher forms of punishment and different enforcement procedures for comparable perceived infractions.

**Zeigler's After-the-Fact Disciplinary Reports Show Pretext**

32. Since his termination Mr. Leonette has discovered that Zeigler falsified records and/or violated its own policies and procedures relating to his personnel record and the issuance of disciplinary reports.

33. Although Mr. Leonette was not made aware of any disciplinary reports being made against him until after he was fired, Zeigler has since come up with four disciplinary reports. The first report purports to warn Mr. Leonette regarding the offense of "Absence (unreported, excessive)" from the office on or about February 21, 2022, just two months after the filing of the police report regarding Zeigler's fraudulent activities. It further suggests that Mr. Leonette could sell more vehicles if he were more engaged with customers. The report was never provided to Mr. Leonette (in violation of company policy/practice), was not signed by Mr. Leonette (in violation of company policy/practice), not witnessed (in violation of company policy/practice), and not dated (also a violation).

34. Moreover, as of the date of this purported infraction, Mr. Leonette had only used four of his fifteen allotted days of PTO for the year (excluding a mandatory 10-day absence due to COVID) according to the company's own records. Even including the COVID absences, he was still under his allotment of PTO days.

35. In an effort to manufacture a false record to support termination, Zeigler placed another "disciplinary report" in Mr. Leonette's file that is dated February 25, 2022 (just three days after the first) for the exact same conduct. Writing up two disciplinary reports for the same alleged conduct violates company policies and

procedures. This report is also unsigned, undated, not witnessed, and never provided to Mr. Leonette. Indeed, not even the manager signed it.

36. The third and fourth disciplinary reports follow this same shady pattern. The third report complains of conduct on or about April 22, 2022, regarding Mr. Leonette's adherence to the schedule, and Zeigler claims to have created the fourth report just four days later (on April 26) for Leonette purportedly asking follow-up questions. The reports were never provided to Mr. Leonette, not signed by Leonette, not witnessed, and not dated.

37. The fourth report includes language stating "final warning before potential Termination" yet termination was never discussed with Mr. Leonette and the report was never shown to him. The report was a total fabrication.

38. On May 31, 2022, Zeigler terminated Mr. Leonette and told him it was for "performance." Throughout Mr. Leonette's almost thirteen-year-long employment, he did not receive a single complaint from management regarding fluctuating sales or absences until, according to Zeigler, February of 2022.

39. Zeigler has since changed its story, claiming it terminated Mr. Leonette for missing too many days of work.

40. Both of Zeigler's explanations are lies.

## COUNT I
## COMMON LAW RETALIATORY DISCHARGE

41. Plaintiff realleges Paragraphs 1 through 40 as fully stated herein as Paragraph 41.

42. Illinois law prohibits discharge in violation of public policy.

43. Illinois public policy encourages citizens to report illegal and/or improper conduct to their employers.

44. It is a violation of Illinois public policy for an employer to retaliate against an employee for engaging in citizen crime-fighter activities such as reporting or complaining about Zeigler's forgery.

45. Mr. Leonette reported and disclosed illegal and/or improper conduct to Zeigler which related to its finance department adding services to customers' purchases without authorization as well as forging signatures of customers.

46. Mr. Leonette complained about the forgery to his manager. A police report regarding the forgery was also filed, and the customer sent a letter to Zeigler's president explaining that Mr. Leonette had determined that the finance department engaged in forgery.

47. Mr. Leonette was discharged for reporting to supervisors what he reasonably believed was the violation of a law, rule or regulation involving the business practices of Zeigler.

48. Zeigler's termination of Mr. Leonette's employment violates Illinois public policy which prohibits employers from retaliating against an employee for citizen crime-fighting activity or whistleblower activity.

49. Zeigler unlawfully discharged Mr. Leonette on May 31, 2022 in retaliation for reporting Zeigler's illegal and/or improper conduct related to its business practices.

50. Zeigler's conduct was malicious, willful and oppressive and in direct violation of the clearly mandated public policy of Illinois.

51. As a result of Zeigler's actions, Mr. Leonette has suffered and will continue to suffer both economic and non-economic harm.

## COUNT II
## RETALIATION UNDER THE ILLINOIS WHISTLEBLOWER ACT

52. Plaintiff realleges Paragraphs 1 through 40 as fully stated herein as Paragraph 52.

53. There has at all pertinent times been in effect in the State of Illinois an act known as the "Illinois Whistleblower Act," 740 ILCS 174/1 *et. seq.* ("IWA").

54. Section 20 of the IWA protects employees by making it unlawful for an employer to take adverse action against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule or regulation. 740 ILCS 174/20.

55. Zeigler had a duty under Illinois law not to retaliate against employees in violation of the IWA.

11

56. Mr. Leonette refused to participate in Zeigler's fraudulent methods of forging documents and stealing from customers, which is a violation of state and federal law.

57. Mr. Leonette had reasonable cause to believe Zeigler's request violated federal and state law, and he refused to partake in this behavior.

58. Zeigler violated the IWA when it retaliated against Mr. Leonette by terminating his employment because of his refusal to participate in Zeigler's unlawful business practices that would result in a violation of federal and state law, rules, and regulations.

59. The retaliatory act of terminating Mr. Leonette's employment in retaliation for his actions was a materially adverse action that affected his compensation, promotion opportunities, and career opportunities, and those actions violated the IWA.

60. As a consequence of Zeigler's actions, Mr. Leonette has been damaged, including a loss of wages and benefits.

## COUNT III
## AGE DISCRIMINATION

61. Plaintiff realleges Paragraphs 1 through 40 as fully stated herein as Paragraph 61.

62. The Age Discrimination in Employment Act of 1967 ("ADEA") makes it unlawful for an employer to discriminate against an employee because of his age. 29 U.S.C. § 621 *et seq.*

12

63. The ADEA protects employees over 40 years of age, and Mr. Leonette was over the age of 40 at all relevant times.

64. Mr. Leonette suffered an adverse employment action because of his age in that Zeigler terminated him and hired younger employees to replace him.

65. Mr. Leonette was meeting Zeigler's legitimate expectations at the time of the adverse employment action because his sale records show that he made significant sales for Zeigler and there were no sales minimums required.

66. Similarly situated, substantially younger employees were treated more favorably than Mr. Leonette in that younger employees were not terminated or disciplined for low sales or pressured to retire, nor were young employees subjected to the same standards for sales.

67. As a result of the age discrimination, Mr. Leonette has suffered damages.

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendant and prays this Court grant the following relief against Defendant:

A. Award Plaintiff appropriate back pay and/or other damages for his past and future loss of wages and benefits and pecuniary losses, plus interest, that he was denied or lost as a result of Zeigler's actions, in amounts to be determined at trial;

B. Order Defendant to reinstate Plaintiff to a position comparable to his former position or, in lieu of reinstatement, award him front pay including benefits;

   C. Order the Defendant to pay Plaintiff compensatory damages, including for the emotional distress damages he suffered as a result of Zeigler's violation of the Illinois Whistleblower Act or the common law rights against retaliatory discharge;

   D. Award Plaintiff liquidated damages incurred in connection with this action;

   E. Award Plaintiff exemplary or punitive damages for violation of the common law rights against retaliatory discharge;

   F. Award Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

   G. Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

Dated: May 30, 2023        Respectful Submitted,

               FRANK LEONETTE

               By:/s/ *Peter S. Roeser*

Peter S. Roeser         Counsel for Plaintiff
Matthew D. Tanner | Ashley J. Roeser
**ROESER TANNER & GRAHAM LLC**
Two North Riverside Plaza, Ste. 1850
Chicago IL 60606
312-621-0303 proeser@rtglaw.com